Arnold Reed
Michigan Bar #P46959
3225 Northwestern Hwy Ste 251
Farmington Hills, MI 48334
Phone: (248) 855-6330
Fax: (248) 855-6340
e-Mail: arnoldreed@earthlink.net

Attorney for Plaintiff
(appearing pro hac vice)


Local Counsel Kendric V. Rollins
California Bar #170564

```
                  FILED
          CLERK U.S. DISTRICT COURT

              AUG 3 1 2011

      CENTRAL DISTRICT OF CALIFORNIA
      B'                        DEPUTY
```

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARETHA FRANKLIN, | ) Case No.: |
| | ) Judge |
| Plaintiff, | ) **EXPARTE APPLICATION FOR** |
| | ) **PRELIMINARY INJUNCTION;** |
| vs. | ) **MEMORANDUM OF POINTS AND** |
| ALAN ELLIOTT, and, AL'S RECORDS | ) **AUTHORITIES IN SUPPORT** |
| & TAPES, | ) |
| Defendant | ) |

TO EACH OF THE ABOVE NAMED DEFENDANTS AND THEIR ATTORNEYS OF

RECORD:

PLEASE TAKE NOTICE THAT at (time) on (date), or soon

thereafter as counsel may be heard, in Courtroom 780 of the

Honorable (Judge), located at (name of federal building)

(address of federal building) Plaintiff Aretha Franklin (herein

"Plaintiff") will move for an order for preliminary injunction

prohibiting and restraining the above-captioned defendants from

infringing upon Plaintiff's rights by releasing or offering for

sale or publicity any film, documentary, movie or concert which

1

utilizes Plaintiff's image, likeness or voice without her written and express authorization.

This exparte application is based upon this Notice of exparte application, the attached Memorandum of Points and Authorities, the concurrently filed Declarations of Aretha Franklin and Rhonda Sturges (See Exhibits B and C, respectively) thereto, the concurrently filed proposed Order of Preliminary Injunction, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

Immediately however, Plaintiff request this court issue the Temporary Restraining Order without written or oral notice because:

    a.    Counsel has reason to believe that the Defendant may immediately release the film to create a fait accompli;

    b.    When counsel asked the Defendant the name of his attorney, the Defendant declined to answer but stated he was the best copyright attorney in the country without more. Thus, attempting to approach counsel prior to filing became impossible.

## I.   INTRODUCTION

Aretha Franklin, ("Plaintiff") is a legendary vocalist and musical artist whose fame and international recognition are arguably unequaled. She is the recipient of eighteen Grammy Awards, been named the ninth greatest singer of all times by Rolling Stones Magazine, is an inductee in the Rock & Roll Hall of Fame, and the solo performer at the inauguration of President

2

Barack Obama.[1] She has been nicknamed the "Queen of Soul,"[2] but is also renown for her single rhythm & blues, jazz, and relevant to this suit -- gospel.

In 1972, Plaintiff was recorded at New Missionary Baptist Church in Los Angeles, California, while performing various musical selections for her bestselling "Amazing Grace" album. This album is the best selling album in Plaintiff's fifty year musical recording career and has received the recording industry's prestigious "double platinum" status. Plaintiff (together with others) holds a copyright on this album. In 1999, Plaintiff released the *Amazing Grace: The Complete Recordings* with additional material from that concert. This was also subject to a copyright.

The performance was also filmed with the Plaintiff's consent, but with her understanding that any commercial release of this recording would be subject to her consent. In fact, the Plaintiff originally contributed both money and time to an aborted project to release this concert in video format. Based on a variety of reasons not relevant to this dispute, Plaintiff decided not to go forward with that project.

The Defendant obtained the deeds to this footage from Warner Brothers Studios in 2007 through a Quitclaim Agreement (See Exhibit A) and has since then produced and released a film entitled "Amazing Grace" for release. The Quit Claim Agreement

---

[1] http://en.wikipedia.org/wiki/Aretha_Franklin (last visited August 14, 2011).
[2] *Id.*

3

directly states that, "in connection to [Defendant's] use of the material" Defendant "will need to obtain authorization from [Plaintiff]."

The development and production of the Amazing Grace movie is unquestionably the kind of "use" for which Defendant must obtain Plaintiff's authorization before releasing. Yet to date, no such authorization has been granted by Plaintiff to the Defendant or anyone else and, as such, Plaintiff has not assigned her rights of publicity to the Defendant or anyone else.

As is stated in the Declaration of Rhonda Sturges, Ms. Franklin's image and performance is continuously displayed in this work. Her appearance is central to the documentary.

The Defendants efforts to obtain this acknowledgement (See Exhibit D: Letter from Defendant to Plaintiff & Exhibit E: Unexecuted Option Contract between Defendant and Plaintiff) demonstrate awareness on part of the Defendant, that Plaintiff's authorization is indeed necessary. The Defendant's failure to obtain Plaintiff's authorization via mutual agreement does not relieve Defendant of his legal obligation to obtain such authorization prior to using the material.

The Defendants currently have scheduled a private viewing of the film during the month of August and on information and belief intend to release the film shortly thereafter. Given Defendants insistence on producing the film and intending to release it without Plaintiff's authorization, Plaintiff has no

4

reasonable alternative but to seek a Court Order enjoining Plaintiff's infringing conduct.

Plaintiff can and will demonstrate the likelihood that it will prevail on its claim for violation of rights of publicity against Defendant. Plaintiff also faces irreparable harm unless Defendants are immediately restrained from engaging in the infringing conduct. Additionally, serious questions are raised and the balance of hardships tips in Plaintiff's favor. Plaintiff therefore respectfully requests that its Exparte Application for Preliminary Injunction be granted.

## II.    STATEMENT OF FACTS

Plaintiff is a world renowned vocalist and musical artist. Plaintiff was recorded in 1972 performing several songs from her album entitled "Amazing Grace." Plaintiff became aware that Warner Bros had obtained title to these recordings and that in 2007 the Defendant obtained title. Plaintiff never authorized the 1972 recording of her performance. (See Exhibit B, Declaration of Aretha Franklin). Plaintiff also never authorized the use of this footage or the release of a movie based on said performance. (See Exhibit B).

Plaintiff became aware that a movie entitled "Amazing Grace" was being produced, created, developed, and promoted for release by the Defendant. Plaintiff did not find the terms of the initial option contract offered by Defendant amenable and as a result did not agree to them. Thereafter, Plaintiff became

5

aware that Defendant intended to proceed with the project and with the release without her consent or authorization. (See Exhibit B).   Plaintiff then filed this action asserting violation of Publicity Rights against Defendant.

## III.   PLAINTIFF SATISFIES THE REQUIREMENTS FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND ITS EXPARTE APPLICATION SHOULD BE GRANTED

### A. Legal Standard for Preliminary Injunctions

Plaintiff seeks to enjoin the Defendant from infringing upon her right of publicity by proceeding with the release of the unauthorized film "Amazing Grace." Indeed "the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits."[3] The Court may grant preliminary injunctive relief to a party who can demonstrate by preponderance of evidence either: "(1) a combination of probable success on the merits and the possibility of irreparable harm; *or* (2) that serious questions are raised and the balance of hardships tips in its favor. [emphasis added] These two formulae represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."[4] If then both of these formulae can be satisfied, then the Plaintiff's exparte application for injunctive relief should be very compelling.   A "serious question" is one on which the movant "has a fair chance

---

[3] *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

[4] *A&M Records, Inc. v. Napster*, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001) (internal quotation and citation omitted).

of success on the merits."[5]

   In this instance, "the status quo is the last uncontested status which preceded the pending controversy." Id. Plaintiff therefore seeks to enjoin Defendant from releasing any film, documentary, movie or concert footage which involves Plaintiff's 1972 performance at the New Missionary Baptist Church in Los Angeles California. California's law regarding the Right to Publicity is governed by its common law and statutory laws which protect the use of a person's "name, voice…or likeness" Cal. Civ. Code § 3344(a). Plaintiff can effectively show an exceedingly high probability of success on her Right of Publicity claim.

### B. Plaintiff Can Establish a High Probability of Success for Violation of the Common Law Right of Publicity Claim.

   California common law recognizes this right of publicity in a person's name, likeness and identity.[6] While California also has a statutory provision to govern the right of publicity, the common law governs a broader range and more expansive scope of interests.[7] The elements of the right of publicity claim at common law are "(1) the defendant's use of Plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercial or otherwise; (3) lack of

---

[5] *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).
[6] *See Midler v. Ford Motor Company*, 849 F.2d 460, 462 (9th Cir. 1988).
[7] *See White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1397-99 (9th Cir. 1992).

7

consent; and (4) resulting injury."[8]

There is no question that the Defendant "used" the Plaintiff's identity or likeness. Not only was the Plaintiffs identity used in the film which was released without authorization, but it was also used in promotional materials as well (See Exhibit F). Equally evident is the fact that the Defendant, a producer, has been and will continue to be advantaged from the appropriation, or more accurately, the misappropriation of the Defendant's name or likeness. Firstly, the Defendant will and indeed already has been economically advantaged by releasing the film itself. On information and belief the Plaintiff has gained hundreds of thousands of dollars and stands to gain tens of millions of dollars through the continued and unauthorized use of the Defendant's name and likeness. Even the Defendant's own modest projections which were provided to the Plaintiff during a failed negotiation attempt project revenues exceeding two million dollars. (See Exhibit A). These substantial economic gains represent a significant advantage that the Defendant has obtained through the misappropriation of the Plaintiff's name and likeness.

Additionally, the advantages that the Defendant has gained and continues to gain exceed those strictly economic in nature and include the commercial advantages of enhancing the defendant's resume, professional repute and industry clout which in turn leads to further commercial opportunities. Indeed the

---

[8] *Eastwood*, 198 Cal. Rptr. at 347.

Defendant's own efforts to secure an agreement with the
Plaintiff include furnishing a curriculum vitae listing his work
with other celebrities, seemingly an effort to *sell* the
Plaintiff on his prominence or status.[9] On information and
belief, the Defendant's production and unauthorized release of
*Amazing Grace* has and will continue to serve this same purpose
of bolstering the Defendant's resume, repute and clout for
commercial purposes. Accordingly, the defendant is benefiting
from the misappropriation of the Plaintiff's name and likeness
indirectly as well as in ways not limited to economics at all.

The third element at common law is satisfied by the clear and
undeniable fact that the Defendant never obtained the
Plaintiff's consent to release the movie. The Defendant's quick
claim agreement with Warner Bros wherein he purchased the deeds
of the footage originally owned by the late Sidney Pollack,
clearly indicates that the Defendant must obtain consent from
the Plaintiff before he uses the material (See Exhibit H: Quick
Claim Agreement include Paragraph reference). Initially, the
Defendant seemed to recognize the need to obtain the Plaintiff's
authorization because he made efforts—albeit unsuccessful—to
obtain the Plaintiff's consent. (See Exhibit E: Proposed Option
Contract offered to Plaintiff). Notwithstanding these efforts,
a fair and mutually beneficial agreement was never established.
Hence, the Defendant is not able to abandon negotiations and
violate the Plaintiff's rights of publicity merely because the

---

[9]*See* Exhibit G: Curriculum Vitae/Bio.

9

Defendant was unable to offer terms that the Plaintiff was amenable to.

The fourth element, injury, is satisfied because Plaintiff's revenue resulting from the use of the name, voice and likeness of Plaintiff deprives Plaintiff of money she could make by exploiting her own right to publicity independently or through licenses. Additionally, the substantial revenues which the Plaintiff has received as a result of releasing this film amount to injury to the Plaintiff which demonstrates a likelihood of success on the merits of its claim for violation of the California common law and statutory right to publicity.

**\*. Plaintiff Can Prevail on Her Anti-Bootlegging Claim.**

In addition to standard common law copyright protections, the United States Congress has passed a specific statute protecting against the distribution of bootleg concert videos. 17 U.S.C. Sec. 1101(1) provides in pertinent part:

> (a) Unauthorized Acts.--Anyone who, without the consent of the performer or performers involved--
>
> (1) fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation,
>
> (2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance, or
>
> (3) distributes or offers to distribute, sells or offers to sell, rents or offers to

> rent, or traffics in any copy or phono
> record fixed as described in paragraph (1),
> regardless of whether the fixations occurred
> in the United States, shall be subject to the
> remedies provided in sections 502 through
> 505, to the same extent as an infringer of
> copyright.

This Court in *Kiss Collection, LTD v. Passport International Productions*, 405 F. Supp. 2d 1169 (C.D. Cal. 2005) ruled that this law protects recordings of broadcast which may have been lawfully made in the first instance, but then distribution in violation of the performer's permission.  The Court further held that the statute protects the artist even where the recording predates the effective date of the act, but was distributed afterwards.  The Court also turned back a constitutional challenge to the statute.

This case is local precedent and directly on point. Ms. Franklin has an excellent chance of prevailing.

**\*. Plaintiff Can Establish a High Probability of Success on Her Breach of Contract Claim.**

Ms. Franklin has a highly viable breach of third-party beneficiary contract claim.[10] California state law recognizes that a party can be a third party beneficiary to a contract and

---

[10] 'A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to plaintiff.' "(*Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350, 1367, italics omitted.)

11

could have standing to sue. [11] Here the contract provided that
Ms. Franklin's consent was required for the Defendant to
proceed.  Defendant  ignored this requirement, constructed a
flawed theory why Ms. Franklin's interest in her performance
were unprotectable and decided to proceed without her consent.

Mr. Elliott took the performance subject to a Quit Claim
Agreement from Warner Brothers.  Whatever interest they may have
had in the performance was being relinquished.  The clause
requiring Ms. Franklin's consent was not a proxy for saying that
it was Mr. Elliott's problem to find a way to deal with the
issue in any legal way he saw fit.  It was saying that he needed
to get Aretha Franklin on board with the agreement.  If Warner
Brothers was happy with allowing Mr. Elliott to go around Ms.
Franklin, there would have been no need for this clause.

This Court must enforce the contract as written.[12] Here,
Warner Brothers was concerned with protecting both the rights of
Ms. Franklin and her good will. It correctly made a decision to
grant her contractual power to refuse this agreement.  She has
done so and her wishes should be honored.

This Court cannot "unring the bell." Ms. Franklin has made
the decision that she does not wish this performance being

[11] *RGIS LLC v Bank of America*, NA, 20LL 1991989 (Cal App 2d Dist, 2011)
[12] *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.App.4th 944, 955, 135 Cal.Rptr.2d 505 (2003).

12

introduced into the public stream at this time.   Without an
injunction, the damage will be done.


### C. Plaintiff Can Establish a High Probability of Success for the Violation of the Statutory Right of Publicity Claim Pursuant to  Cal Civ. Code § 3344

The California legislature has created a statutory right of
publicity in a person's "name, voice, signature, photograph, or
likeness." Cal. Civ. Code § 3344(a). California law not only
provides for the protection of publicity rights through an
action for damages but Plaintiff may also seek enjoinment from
the exploitation of her rights of publicity.[13] In addition to the
four elements required under common law the statutory law
imposes two additional requirements, (5) a *knowing* use of the
Plaintiff's name, photograph or likeness and (6) a direct
connection between the use and the commercial purpose. Id.

There is absolutely no question that the Defendant's use of
the Plaintiff's name or likeness was "knowing." In fact, the
appropriation of the Plaintiff's name, likeness and voice in
*Amazing Grace* constitute the very basis of the movie and
producing it was a project years in the making that required
conscious and deliberate intent. The Plaintiff's *Amazing Grace*
album is her bestselling album of all time hence the use of her
name, voice and likeness on the *Amazing Grace* movie represents
an extremely lucrative opportunity, and one which was sought
after with intent. It is not only unreasonable to believe that

---

[13] See Lugosi v. Universal Pictures, 25 Cal. 3d 813, 160 Cal.
Rptr. 323, 328, 603 P.2d 425 (Cal. 1979); Eastwood, 198 Cal.
Rptr. at 348.

13

the Defendant could have used the Plaintiff's name or likeness unknowingly but it is practically impossible. Here again the Defendant's efforts to negotiate a deal with the Plaintiff to release her rights demonstrate his knowledge that he would in fact be using her name and likeness. (Exhibit D).

Satisfying this last element of rights of publicity under statutory law requires a brief look at the connection between the use of the name or likeness and the commercial purpose. As elsewhere stated, the appropriation of the Plaintiff's name, likeness and voice constitute the very basis of the movie. The Plaintiff's world renown fame and international recognition as the "Queen of Soul" solidify the connection between the use and the commercial purpose. The Defendant utilized the name, the likeness and the voice of the Plaintiff to create and offer for sale a movie which is about the Plaintiff and one of her critically acclaimed performances. The connection between the use and the commercial purpose is not only direct but immediate. No stretch of proximity is required to establish the connection between using the Plaintiff's name, likeness and voice to sell a movie which is itself based on the Plaintiff's name, likeness and voice. Furthermore, by offering for sale a movie based on Plaintiff's recorded performances without authorization Defendant is "using" the likenesses for commercial purposes. Accordingly, the Plaintiff has satisfied all of the elements for the statutory law governing right of publicity.

The fourth element, injury, is satisfied because Plaintiff's revenue resulting from the use of the name, voice and likeness

14

of Plaintiff deprives Plaintiff of money she could make by
exploiting her own right to publicity independently or through
licenses. Hence the statutory elements are satisfied. Defendant
knew that he was using Plaintiff's name and likeness in a manner
central to commercial purposes as evidenced by, inter alia, his
attempt to enter into a contractual agreement with Plaintiff to
that very end. Plaintiff has demonstrated a likelihood of
success on the merits of its claim for violation of the
California common law and statutory right to publicity.

### D. Plaintiff Can Establish a High Probability of Success for the Unjust Enrichment Claim

California courts have long recognized a cause of action based
on unjust enrichment.[14]

By Defendant's wrongful acts and omissions, Defendant has
unjustly enriched himself at the expense, and to the detriment,
of the Plaintiff. The Defendant has violated and continues to
violate the Plaintiff's rights of publicity through his release
and continued promotion of *Amazing Grace*. The release of this
film has lead to substantial economic gains by the Defendant
(See Exhibit A: Revenue Projections) which Defendant is not
entitled to receive.  Additionally, by presenting the film as if
it was authorized by the Plaintiff and by promoting and
releasing said film, Defendant has also boosted his reputation
and recognition in the industry which invariably leads to
further opportunities to be unjustly enriched and to exploit the

---

[14] *Western Pac. R. Corp. v. Western Pac. R. Co.*, 206 F.2d 495,
498 (9th Cir. 1953); *Lectrodryer v. SeoulBank*, 77 Cal.App.4th
723, 726 (2000).

name, image and voice of the Plaintiff without her authorization. Although, Defendant may own the deeds to the footage, he has not obtained Plaintiffs full and complete release and authorization to use the material.

By releasing Amazing Grace without authorization and using it for commercial purposes, the Defendant has gained hundreds of thousands of dollars to date and has also led to an amount in controversy which far exceeds $75,000.00.

### E. Plaintiff Can Establish Irreparable Harm for relief for Violation of Right of Publicity at Common Law and per State Statute

Several courts have held that a celebrity's property interest in his or her name and likeness is unique, and cannot reasonably be compensated by money damages.[15] Thus Defendant's unauthorized use of Plaintiff's name, voice and likeness is per se causing irreparable harm. Additionally, Defendant's disregard to Plaintiffs rights of publicity and insistence on releasing a movie without authorization undermine the value of a celebrity's property interest in his or her name or likeness. The market for the publicity rights would collapse and the rights themselves would be rendered valueless without the ability of the law to adequately protect them through injunctions. Punishing violations of publicity rights after the fact through damages cannot effectively enforce the law in this respect to the same degree that issuing an injunction can and often does.

---

[15] See Ali v. Playgirl, Inc., 447 F. Supp. 723, 729 (S.D.N.Y. 1978); Uhlaender v. Henricksen, 316 F. Supp. 1277, 1283 (D. Minn. 1970); see generally 1 J. Thomas McCarthy, Rights of Publicity & Privacy § 11.6[B] (1997).

## F. Plaintiff Can Establish Irreparable Harm regarding Unjust Enrichment claim

The Plaintiff brought this cause of action before the court because the Defendant completely disregarding her rights of publicity after failing to come to an agreement regarding her release. Because the Defendant moved full speed ahead without regard to the rights or the interest of the Plaintiff and unlawfully and illegally released "Amazing Grace", all proceeds directly or indirectly attributable to the release have been obtained unjustly. The enrichment that the Defendant has received has caused irreparable harm to the Plaintiff in that they preclude the Plaintiff from receiving such funds under a legal agreement should one have been entered.  The Defendant has no right to the proceeds from a movie which was released without the full and complete authorization of the Plaintiff and hence any and all revenues, particularly those which constitute a profit represent irreparable harm to the Plaintiff.

## G. Plaintiff Can Demonstrate That Serious Questions Are Raised and the Balance of Hardships Tips in Plaintiff's Favor

A preliminary injunction may be granted if serious questions are raised sufficient to require litigation and the balance of hardships tips in favor of Plaintiff.[16] A "serious question" is one on which the moving party "has a fair chance of success on the merits."[17] Even from a cursory review it is evident that

---

[16] *Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134, 204 USPQ 354, 357-358 (9th Cir. 1979).

[17] *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

17

Plaintiff has raised serious questions in this lawsuit and by this motion which have a substantial probability of success. Plaintiff can also demonstrate that the balance of hardships sharply favor the Plaintiff.

If the exparte application for preliminary injunctionis not granted the rights of publicity which are currently being ignored and disregarded will lose further commercial value. Without the court enjoining the Defendant from his injurious conduct, the very scope and purpose of publicity rights would be further undermined. Specifically, in a market where supply and demand dictate value, failing to protect the rights of publicity leads to oversaturation of publicity and undermines the value of the rights to the publicity itself.

On the other hand, if the preliminary injunction exparte application is granted, there will be little to no material harm to Defendant, other than forgoing the opportunity for revenues which he was never entitled to receive. The balance of hardships weighs in Plaintiff's favor and accordingly, this Motion for Preliminary Injunction must be granted.

Defendants' took what little interest they pay possess in the videos in question by virtue of a "quit claim" agreement which purported to convey only what interest Warner Brother Studios might possess. The agreement also expressly placed them on notice that Warner Brothers was not warranting any interest it might have in the agreement. More importantly in Paragraph 2 of the agreement Defendant expressly agreed to obtain Ms.

18

Franklin's consent.   Defendants tried to obtain this agreement and failed. They cannot claim that there was detrimental reliance on this agreement. In fact, there failure to comply with this condition may operate as a forfeiture of any rights they may have under the agreement.


    H.    **Defendants' Probable "Fair Use" Defense Is Unlikely to Prevail.**

During prefiling communication with Defendant Elliot, he told counsel that he believed that his production fell within the fair use exception.[18]

_____

[18] The fair usage exception to federal copyright law is contained in 17 U.S.C. Sec. 107 which provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> > (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> >
> > (2) the nature of the copyrighted work;
> >
> > (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

It is important to stress that the use at issue is not the use of a few seconds or even minutes of the Plaintiff's performance.   Plaintiff was provided a prerelease copy of the DVD and the same has been viewed by the undersigned counsel. The overwhelming percentage of this production consists of video of the Plaintiff's award winning performance.

The Ninth Circuit enjoined a video-graphic unauthorized biography of the recording artist Elvis Presley in a case very similar to the instant case.   In *Elvis Presley Enterprises v Passport Video*, 349 F3d 622 (9th Cir. 2003), the Court heard an appeal from the grant of a preliminary injunction on this video.

Defendants produced an unlicensed 16 hour video documentary about the life of Elvis Presley.   The biography was extensive. It included over 200 interviews with various individuals about Elvis' life and went through his life in chronological order. The video also used numerous hours of copyrighted video in a variety of ways.   Some of the usages were voiced over video images of Elvis speaking on TV while the commentator provided narration.   The Court also noted that 5% to 10% of the album used copyrighted materials.   In that footage, however, was a nearly one minute uninterrupted clip of Elvis Presley performing "Hound Dog" on the Steve Allen Show.   *Id.* at 625-626.

> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

20

The Ninth Circuit first rejected that defendant's claims that a preliminary injunction would be a First Amendment violation.   The Court found that the First Amendment arguments are "subsumed in the within the fair usage inquiry." *Id.* at 626.   The Court then held that the Plaintiff did not wait too long to file the suit when they filed the same within two months of release of the video. *Id.* at 626.   Here, the documentary has not been officially released.   On information and belief, there may have been one showing and several "screener copies" of the video released to critic.   It has not been released to the general public.

The Ninth Circuit distinguished this Court's prior ruling in *Trust Co. Bank v. Putnam Publishing Group*, 5 U.S.P.Q.2d 1874 (C.D. Cal, 1988).   There, the Court held that the Defendant may have waited too long where it had full knowledge of the content of the infringing book for over two years before they brought suit.   While Plaintiff had some knowledge that Defendant Elliot was producing this video, she was not aware that was little more than a verbatim broadcast of the original event until she saw the same.   By definition, it is almost impossible to tell if someone has exceeded the fair use doctrine until he/she has seen the video.

The Court also considered the non-dispositive factor that the Defendant was using the material for profit.   The Court stated that the factor is "not controlling," but weighs against a finding of fair use.   The Court also said that degree which the new user exploits copyright for commercial gain-as-opposed

21

to incidental use as part of a commercial enterprise–affects the weight we afford commercial nature as a factor.[19] Here the venture is entirely commercial.

The work is not transformative.  The work is little more than a video recording of the Plaintiff's long released performance.  The Court distinguished a New York Court's ruling in *Monster Communications, Inc. v. Turner Broadcasting System*, 935 F. Supp. 490, 491 (S.D. N.Y. 1996) where the Court upheld two minutes worth of copywritten video as part of a biography on the life of boxer Muhammad Ali.

The *Elvis Presley Enterprises* Court also asked the question whether the purpose of the film was to "recreate the creative expression reposing in [the original work]."  That is precisely the purpose of the film.  At trial, Plaintiff intends to demonstrate that some purchasers of this film may do so as an alternative to purchasing her copywritten Amazing Grace albums.

It should be noted that the Plaintiff ultimately obtained summary judgment in the Elvis Presley suit.  A copy of Judge Lew's order is attached Exhibit I.  Judge Lew stated that when viewed as a whole, the production of the video "drastically" diluted the value of the Plaintiff's copyright.  Here, this video will do precisely the same thing.

The fact that the Plaintiff chose to record her album before a large audience does not constitute an abandonment of

---

[19] *Id.* at 627 (quoting *Harper & Row Publishers v Nation Enter.*, 471 U.S. 539, 562, 105 S Ct 2218, 85 Led 2d 588 (1985)).

her copyright in this performance.  As the United States Supreme Court recognized in *Ferris v Frohoman*, 223 U.S. 424 (1912): "the public representation of a dramatic composition, not printed and published, does not deprive the owner of his common-law right…. The public performance of the play is not an abandonment of it to the public."

This Court should grant the preliminary injunction at issue.

I.   **Only a Pro Forma Bond Should be Required for Security. The Two Week Delay of a Movie of a Forty Year Old Event is Not Likely to Create Substantial Damages.**

This Exparte Application seeks to enjoin by two weeks the release of a movie of a forty year old event. At that time, there will be a hearing and there will be presumably more exposure to the possible damages that the Defendant may suffer. As of today, Plaintiff can only speculate about the damages because
the film about the Plaintiff and her concert was produced without any input from her.

Counsel requested information from the Defendant, but they have been guarded in the information they released.  Defendants would provide counsel with the name of their counsel so he has not been able to talk to counsel.  Defendants provided counsel with a copy of their Quit Claim agreement with Warner Brothers, but redacted critical passages from the agreement.  Counsel

cannot tell at this time whether the Defendants have booked theaters, whether they have contracts with liquidated damages, or many of the other factors associated with determining the amount of damages.

Counsel has looked through the various movie database and does not see any release dates for the movie.  Defendant Eliot's blog entries are also not up to date. If they are planning an October release, the injunction will cost them no damages.  If there are real and substantial damages, counsel for the Defendants can provide the Plaintiff with this evidence prior to the hearing date and the matter can be addressed at the preliminary injunction hearing. A Declaration from Counsel about this is attached.

The purpose of a bond it protect the Defendant from the harm associated with
a wrongfully issued TRO.  Commerce Tankers Corp v Nat'l Mar Union of Am, AFL-CIO, 553 F2d 793 (2d Cir 1977).  Since it I unlikely that the Defendant will suffer a real or appreciable harm, this Court should set a pro forma bond.  If the Defendants produce evidence proof of clear damages relating to the delay in releasing their film, this Court can adjust it.  Counsel, however, suspects that there will not be clear damages.  Again, we are talking about footage which is nearly forty years old.

## IV. CONCLUSION

Although the crux of Plaintiff's concerns hinges on the violation of her rights of publicity both at common law and statutorily, the Defendant has also been unjustly enriched at the expense of the Plaintiff and has violated contractual obligations to which Ms. Franklin is a third party beneficiary. It is also noteworthy to consider that Plaintiff never authorized the recordings to begin with. As such this exparte application for a preliminary injunction seeks to preclude the Defendant from exploiting rights which have already been disregarded. Plaintiff therefore seeks an order of preliminary injunction requiring Defendant to refrain from releasing the film "Amazing Grace" without Plaintiff's full and complete release and authorization.

Dated this August 30, 2011          Respectfully submitted,

                                    ARNOLD REED & ASSOCIATES

                                    ARNOLD E. REED
                                    Attorney for Plaintiff

EXPARTE APPLICATION PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

# EXHIBIT A

## Amazing Grace Gross Revenue Projections

| Source | Amount | Details |
|---|---|---|
| Theatrical | | $ 200,000.00 Based on similar projects |
| HBO Domestic Television Broadcast | | $ 125,000.00 |
| PBS Domestic Television Broadcast | | TBD |
| Foreign Television Broadcast | | $ 992,500.00 |
| Domestic DVD Release | | $ 1,089,630.00 $6 Wholesale Per Unit. 181,605 Units |
| International DVD Release | | $ 454,010.00 $5 Wholesale Per Unit 90,802 Units (50% of Domestic Units) |
| Broadband Distribution | | $ 32,375.00 |
| **TOTAL PROJECTED GROSS REVENUE** | | **$ 2,893,515.00** |

### Foreign Television Broadcast Projection Details:

| Major Foreign Territories | Documentary Release |
|---|---|
| Germany | $ 25,000.00 |
| United Kingdom | $ 700,000.00 |
| France | $ 25,000.00 |
| Italy | $ 20,000.00 |
| Spain | $ 20,000.00 |
| Netherlands | $ 15,000.00 |
| Scandinavia | $ 20,000.00 |
| Belgium | $ 15,000.00 |
| Austria | $ 15,000.00 |
| Russia | $ 25,000.00 |
| Poland | $ 15,000.00 |
| Czech Republic | $ 5,000.00 |
| Hungary | $ 7,500.00 |
| Canada | $ 25,000.00 |
| Japan | $ 20,000.00 |
| Australia | $ 20,000.00 |

| | | |
|---|---|---|
| Mexico | | $ 10,000.00 |
| Brazil | | $ 10,000.00 |
| | **TOTAL** | **$ 992,500.00** |

**Domestic DVD Release**

**2006 LONGFORM MUSIC DVD UNIT SALES DISTRIBUTION (U.S. AND CANADA)**

| Title | Tracked Units | Total Estimated Units |
|---|---|---|
| Farewell Tour Live From Melbourne - Eagles | 570,788 | 1,038,834 |
| Under The Desert Sky - Andrea Bocelli | 458,913 | 835,222 |
| Greatest Hits - Creed | 423,264 | 770,340 |
| Pulse - Pink Floyd | 355,930 | 647,793 |
| We Are the Laurie Berkner Band - Laurie Berkner | 285,439 | 519,499 |
| Information – Beck | 282,380 | 513,932 |
| Past, Present & Future - Zombie Rob | 231,646 | 421,596 |
| Kissology 1974-1977 V1 - Kiss | 166,330 | 302,721 |
| Live at Donington - AC/DC | 156,034 | 283,982 |
| Caught in the Act - Michael Buble | 146,959 | 267,465 |
| Best of Pantera Far Beyond - Pantera | 146,935 | 267,422 |
| Silence in Black and White - Hawthorne Heights | 145,318 | 264,479 |

| Title | | |
|---|---|---|
| Encore - Il Divo | 141,777 | 258,034 |
| Live in Atlanta - Destiny's Child | 139,451 | 253,801 |
| Live at the Greek - Il Divo | 124,036 | 225,746 |
| Family Jewels - AC/DC | 123,471 | 224,717 |
| Bullet in a Bible - Green Day | 123,258 | 224,330 |
| Live at Woodstock - Jimi Hendrix | 121,789 | 221,656 |
| Long Road Home - John Foggerty | 120,519 | 219,345 |
| Number Ones - Michael Jackson | 120,216 | 218,793 |
| Rock of Ages - Def Leppard | 115,877 | 210,896 |
| Greatest Hits 1978-1997 - Journey | 109,353 | 199,022 |
| Vertigo/2005: Live From Chicago - U2 | 106,418 | 193,681 |
| Tour Generacion en Vivo - RBD | 102,254 | 186,102 |
| Music & Passion Live From Las Vegas - Barry Manilow | 100,452 | 182,823 |
| Live at Montreux 1994 - Johnny Cash | 99,114 | 180,387 |
| Live at the Rainbow - Bob Marley & the Wailers | 98,339 | 178,977 |
| Elvis: '68 Comeback - Elvis Presley | 98,220 | 178,760 |
| Led Zepplin DVD - Led Zepplin | 95,550 | 173,901 |
| Live at Wembley '86 - Queen | 86,094 | 156,691 |
| Live at Wrigley Field - Jimmy Buffet | 85,219 | 155,099 |
| Videos 1989-2004 - Metallica | 85,022 | 154,740 |
| Elvis Aloha From Hawaii - Elvis Presley | 84,934 | 154,580 |
| Anywhere But Home - Evanescence | 84,672 | 154,103 |
| R30 - Rush | 82,093 | 149,409 |
| Space Within US - Paul McCartney | 78,910 | 143,616 |
| Collision Course - JayZ/Linkin Park | 75,855 | 138,056 |
| I'm Going to Tell You a Secret - Madonna | 72,929 | 132,731 |
| American Classic - Tony Bennett | 72,789 | 132,476 |

| | | |
|---|---|---|
| Eric Clapton Crossroads Guitar - Eric Clapton | 69,645 | 126,754 |
| Replay X3 - Rush | 66,845 | 121,658 |
| Live in Bucharest - Michael Jackson | 66,308 | 120,681 |
| Livin' Right Now - Keith Urban | 65,460 | 119,137 |
| Celtic Woman - Celtic Woman | 65,011 | 118,320 |
| Trapped in the Closet Chapters - Kelly R. | 62,555 | 113,850 |
| Live by Request - Santana | 62,277 | 113,344 |
| Live From Austin Texas - Johnny Cash | 59,987 | 109,176 |
| Life on the Murder Scene - My Chemical Romance | 59,248 | 107,831 |
| Whiskey on a Sunday - Flogging Molly | 58,760 | 106,943 |
| Freak 'n Roll Into the Fog - Black Crowes | 57,868 | 105,320 |
| | | |
| Total Top 50 Titles | | 12,398,770 |
| | | |
| **Average** | | **247,975** |
| **Median** | | **181,605** |

(1) Nielsen VideoScan data does not track sales at several major retailers including WalMart, Target and Toys-R-Us. It is estimated that these omitted retailers account for 40% - 50% of the DVD sell-through market. Raw units were therefore multiplied by a factor of 1.82 to approximate total estimated units sold in the U.S. and Canada.

**Broadband Distribution**

| | |
|---|---|
| Encoding Costs | $ 5,000.00 |
| Estimated Retail Price Per Download | $ 2.99 |
| Retailer Split | $ 0.49 |
| Wholesale Price | $ 1.50 |
| Number of Downloads | $ 25,000.00 |
| **TOTAL** | **$ 32,375.00** |

**Theatrical Revenue**
*Similar Films:*

| Film | Domestic Gross | Year Released |
|---|---|---|
| Lightning In A Bottle | $ 201,000.00 | 2004 |
| A Great Day in Harlem | $ 527,000.00 | 1994 |
| The Last Waltz (2nd release) | $ 325,000.00 | 1978 |
| End of the Century: the Ramones | $ 392,000.00 | 2003 |
| Sketches of Frank Gehry | $ 435,000.00 | 2005 |
| Shut Up and Sing | $ 1,210,000.00 | 2006 |
| Standing in the Shadows of Motown | $ 1,600,000.00 | 2002 |
| Woodstock | $13,300,000.00 | 1970 |
| Buena Vista Social Club | $18,000,000.00 | 1999 |

**Amazing Grace Budget**
**4.25.8**

| | | |
|---|---|---|
| Laser Pacific HD dailies transfers,conforms | $ | 175,832.00 |
| Technicolor Sound services | $ | 104,384.00 |
| | | |
| Potential costs for Synch Licenses | $ | 100,000.00 |
| Royalty advances for DVD | | TBD |
| Legal fees, clearances, ETC | $ | 40,000.00 |
| | | |
| Film and finish interviews | $ | 80,000.00 |
| | | |
| Film  Editor | $ | 80,000.00 |
| Film Editor assistant | $ | 28,128.00 |
| line producer | $ | 50,000.00 |
| avid/labor/ | $ | 24,000.00 |
| petty cash/rentals (all)/ tape stock/ incidentals | $ | 10,000.00 |
| | | |
| Directorial Costs | | TBD |
| Screenings | | TBD |
| | | |
| Production assistants | $ | 52,000.00 |
| office space | $ | 24,000.00 |
| | | |
| Continuity (spotting script) | $ | 12,500.00 |
| Sound License Fees | $ | 12,500.00 |
| Trailer or marketing Materials | | TBD |
| Optical Soundtrack | | TBD |
| | | |
| Producer Fees- Herb Jordan/Alan Elliott | $ | 200,000.00 |
| | | |
| subtotal | $ | 993,344.00 |
| 10% overage | $ | 99,334.40 |
| **total** | $ | 1,092,678.40 |

**Film Editor (16 weeks at $5000/ week)**
**Film Editor assistant (16 weeks at $1758/ week)**

**And this does not include theatrical --**

# EXHIBIT B

## Declaration

I, Aretha Franklin, do hereby swear and affirm that if called upon to testify, I would testify to the following including but not limited to:

a. That in 1972, I did a live recording of my album Amazing Grace at the New Missionary Baptist Church in Los Angeles, California.

b. That the recording of this album was videotaped.

c. That Mr. Alan Elliott, owner of Al's Tapes and Records claims to have purchased the rights to the film or footage of my 1972 performance at the New Missionary Baptist Church in Los Angeles, California.

d. That I have never given permission or entered into any agreement, verbal, written or otherwise with Alan Elliott, Al's Tapes & Records or any entity to exploit my name and or likeness for commercial purposes with regards to the "Amazing Grace" movie, or any film or footage of my 1972 performance at the New Missionary Baptist Church in Los Angeles, California.

e. That in spite of not having prior authorization, as referenced above, Mr. Alan Elliott has plans to release a movie based on my 1972 performance as mentioned above which exploits my name and likeness solely for commercial purposes.

Further affiant sayeth not

ARETHA FRANKLIN

# EXHIBIT C

## Declaration

I, Rhonda Jacobs-Sturges do hereby swear and affirm that if called upon to testify, I would testify to the following including but not limited to:

1. That I have watched a live video recorded performance of Aretha Franklin singing at the New Missionary Baptist Church in Los Angeles, California.
2. That the video is more than 128 minutes long with more than 80% directly focused on Aretha Franklin performing her songs.

Further affiant sayeth not.

RHONDA JACOBS

8/24/11

JUANITA R. COE
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES May 27, 2012
ACTING IN COUNTY OF
Oakland

# EXHIBIT D



# alan elliott
### 1633 north stanley avenue
### los angeles, ca 90046
### 323.988.9692
fax: 866.245.2939
e-mail: alan@alanelliott.net

November 12, 2008

Ms. Aretha Franklin
c/o Rick Levy
ICM

Dear Ms. Franklin,

Please let me introduce myself. I am the gentleman who on the recommendation of our late mutual friend Mr. Jerry Wexler bought the film of the "Amazing Grace" sessions from Warner Brothers.

As Mr. Wexler may have told you, I used to work as a staff producer at Atlantic Records and I believe "Amazing Grace" is the most important document of gospel music ever recorded- and filmed.

It was a great honor to work with Mr. Wexler. He was, as he liked to say, a "true believer" and his insistence- his **belief** was rare (and infectious) and for those who knew and loved him, he and that belief are missed.

As you know, I have been working with Mr. Rick Levy to make sure a finished "Amazing Grace" movie will receive the special attention it commands, starting with a screening at the White House.

I would be honored if you would meet with me- even if only for a few minutes- so you can see my passion, my ability and my belief that will help make this project something you will be proud to have me associated with.

Thank you.

With all respect, I am

Mr. Alan Elliott

# EXHIBIT E

**RICHARD B. LEVY**
CHIEF BUSINESS DEVELOPMENT OFFICER
AND GENERAL COUNSEL
Office of the Chairman

September 10, 2008

VIA FEDERAL EXPRESS

Ms. Aretha Franklin
C/O Trump International NYC
One Central Park West
New York, NY 10023

Re: *Option Agreement for Al's Records and Tapes and Aretha Franklin regarding*
*Amazing Grace*

Dear Ms. Franklin,

Enclosed please a formal proposed contract to option your rights for the "Amazing Grace"
film project.  Once you have had an opportunity to review the document, please call me to
discuss.

Warmest Regards,

/s/

Richard B. Levy

RBL:drc

Enclosure

## OPTION AGREEMENT

THIS OPTION AGREEMENT is effective as of August __, 2008, by and between Al's Records and Tapes, c/o Endeavor, 9601 Wilshire Blvd., Third Floor, Beverly Hills, CA 90210, Attn: Ariel Emanuel ("Producer") and Aretha Franklin, c/o ICM, 10250 Constellation Blvd., Los Angeles, CA  90067, Attn: Rick Levy ("Artist") and is based on the following facts:

A.  Artist permitted a film crew, directed by the late Sydney Pollack, to film her recording sessions for her record album entitled "Amazing Grace" and other related material (the "Materials") for a motion picture that was unfinished (the "Original Picture").

B.  Producer has advised Artist that Producer controls the rights to utilize the Materials for the purposes of completing the Original Picture, which may include both the Materials and additional materials.  The Original Picture, when completed by Producer, is referred to herein as the "New Picture".

C.  Artist is willing to grant Producer the right to utilize her performance or appearance as embodied in the Materials, as well as in any additional materials that Producer may acquire for inclusion in the New Picture ("Additional Materials"), as part of the New Picture on the terms set forth herein.

Based on the foregoing facts (which comprise part of this Agreement), Producer and Artist hereby agree as follows:

1.    Option.

(a)    For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, including but not limited to, Producer's commercially reasonable efforts to develop and raise financing for the New Picture, Artist hereby grants Producer the exclusive and irrevocable right and option (the "Option") to acquire the exclusive rights (the "Rights") in and to the Materials and the Additional Materials as set forth herein.   The term of the Option ("Option Period") shall commence on the date hereof and shall terminate on the date six (6) months following execution of this Agreement by Artist unless the Option has been exercised as provided herein.   If at the end of the Option Period, Producer is engaged in bona fide negotiations with one or more qualified financiers, the Option Period shall be extended for a period of time not to exceed forty-five (45) days within which to conclude such negotiations.

(b)    During the Option Period, Producer may engage in development, financing, preproduction and marketing activities with respect to the New Picture.  Any materials created by or on behalf of Producer during the Option Period shall be Producer's property, whether or not the Option is exercised. Any materials created by Artist on behalf of Producer during the Option Period shall be Artist's property, whether or not the Option is exercised.

127,514,340v3                          1

2.    <u>Exercise of Option</u>.  Company may exercise the Option by payment to Artist of the sum of  One Million Dollars ($1,000,000) as follows:

(a)    Five Hundred Thousand Dollars ($500,000) shall be payable prior to the expiration of the Option Period, as it may be extended, or on commencement of <u>EDITING</u> of the New Picture, if earlier; and

(b)    Five Hundred Thousand Dollars ($500,000) shall be payable upon the earlier of theatrical release of the New Picture, the date of initial television exhibition, or the date of home video release, but in no event more than eighteen (18) months after the initial payment in 2(a) is made.  "Theatrical release" shall not include screenings at festivals or for sales purposes.

(c)    Notwithstanding the foregoing, if the production budget for the New Picture exceeds $3,000,000, the parties hereto agree to negotiate a new higher option exercise price.

3.    <u>Additional Compensation</u>.  Artist shall be entitled to receive an amount equal to 50% of 100% of all gross receipts received by Producer from all sources of exhibition and exploitation of the New Picture, after Producer has recouped the option payments and its direct costs of development, production and distribution of the New Picture without interest and overhead.  In the event that Producer grants any "back end" profit participations to any third party, the amount of such participations shall be deducted "off the top."  Producer shall account to Artist and pay to Artist her share of such additional compensation within thirty (30) days following the end of each calendar quarter in which Producer receives any such gross receipts following the initial release of the New Picture. Artist shall have the right to audit Producer's books and records in connection with such receipts and payments once per each twelve (12) month period.  Producer's accounting statements shall become final and conclusive and not subject to legal action on the date twenty-four (24) months following the delivery of the applicable accounting statement to Artist, unless Artist has commenced legal proceedings prior to such date.
For purposes hereof, the term "Producer" includes Alan Elliott, Herb Jordan and any loanout or other entities affiliated with either of them.

4.    <u>Credit</u>.  Producer shall accord Artist with credit on screen as the star performer of the New Picture, in a separate card in the main titles in first position with respect to any other performers.  Additionally, Producer shall accord Artist credit on screen in the form of  "Producer" on a separate card in either the main titles or end titles, in the same grouping of credits as all other "Producer" or "Produced by" credits.  Producer shall also accord Artist the foregoing credits in all paid advertisements under the control of Producer, subject to customary exclusions.  All other matters concerning credit shall be determined by Producer in its sole discretion after meaningful good-faith consultation with Artist.  No casual or inadvertent failure to accord any such credit or failure by third parties to accord such credit shall constitute a breach hereof by Producer, provided that

Producer shall use commercially reasonable good faith efforts to prospectively cure any such breach promptly following receipt of written notice thereof from Artist.

5.    Clearances.  If requested by Producer, Artist shall assist Producer in contacting family members, business associates and others whom Producer may wish to appear in the New Picture so that Producer may obtain the necessary rights.  Artist makes no representation or warranty that any third parties will agree to appear in the New Picture.

6.    Consultation With Artist and Controls.

(a)    Producer shall meaningfully consult with Artist's representatives regarding the sales and distribution strategy, negotiations, and agreements for the New Picture.

(b)    Producer shall not alter Artist's performance in any way other than cutting for time or intercutting with other material.

7.    Grant of Rights.  If the Option is exercised, Artist hereby grants, sells and assigns to Producer, exclusively and irrevocably, in perpetuity and throughout the universe, all of the following (collectively, the "Property"):

(a)    All of Artist's right, title and interest in and to the appearance by Artist in the Materials and the Additional Materials (if any) for the purpose of including same in the New Picture, including but not limited to Artist's musical performances, interview segments and "behind the scenes" footage, and each and every element thereof, and any and all rights therein and thereto;  and

(b)    All contracts, agreements, assignments and instruments of every kind and character under which Artist may have heretofore acquired or may hereafter acquire any right, title and interest in or to the Picture (collectively, the "Underlying Agreements"), if any. excluding any album rights.

8.    Exploitation of the Property.  If the Option is exercised, Producer shall have the right to exploit the Property hereunder in any and all media now known or hereafter devised in perpetuity including, without limitation, in all forms of television (including, without limitation, free, pay, cable, pay-per-view, video-on-demand, digital, satellite, subscription, and any other analogous delivery systems), internet and all digital media systems, print publication, theatrical, non-theatrical, all forms of  home video devices including but not limited to DVD and Blu-Ray, computer and electronic media, wireless devices, and all ancillary and derivative rights of every kind, whether or not now known or invented; provided, however, that Artist reserves any and all audio-only soundtrack rights.

9.    Name and Likeness.  Producer shall have the right in perpetuity to use, and authorize others to use, Artist's image, voice and likeness and reproductions of Artist's image, voice and likeness in the New Picture and Artist's name and Artist's biographical

data, in connection with the advertising, publicizing, promotion and exploitation of the New Picture and all ancillary and subsidiary rights therein (including, without limitation, in promotional films, with respect to both "behind-the-scenes" footage and interviews and excerpts from the New Picture, recordings on home video devices and the packages thereof); provided, however, that Artist shall not be depicted as using, consuming or endorsing any product or service without Artist's prior written consent. Producer shall also have the right to use film clips and excerpts from the New Picture involving Artist in all promotional materials relating to the New Picture.

10.    Representations and Warranties. Artist represents, warrants and agrees that: (a) Artist is free to enter into this Agreement and is not subject to any conflicting obligations which will prevent Artist from, or interfere with, the execution and performance of this Agreement, or which will or might conflict with or impair the complete enjoyment of the rights granted to Producer hereunder; (b) Artist has not sold, transferred, assigned, disposed of or otherwise encumbered any of Artist's right, title or interest in and to any of the Property [other than to WBs]; (c) to the best of Artist's knowledge, there are no liens or encumbrances on the Property and no claims have been made or litigation instituted or, to its knowledge, threatened with respect thereto; (d) Artist has duly performed all of her obligations, if any, contained in the Underlying Agreements prior to the date of execution hereof, including, but not limited to, all payment obligations thereunder, if any; and (e) Artist has not produced or authorized the production of any motion picture, television or dramatic presentation based on the Property other than the Picture.

11.    Indemnification.

        (a)    Artist shall indemnify, defend and hold harmless Producer, its officers, directors, members, employees, licensees, agents, representatives, successors and assigns from and against any and all damages, judgment, liabilities, costs, losses, fees and expenses (including reasonable outside attorneys' fees and court costs) arising or resulting from any breach of any of Artist's representations, warranties, or agreements contained herein.

        (b)    Producer shall indemnify, defend and hold harmless Artist, its officers, directors, members, employees, licensees, agents, representatives, successors and assigns from and against any and all damages, judgment, liabilities, costs, losses, fees and expenses (including reasonable outside attorneys' fees and court costs) (collectively, "Claims") arising or resulting from any breach of any of Producer's representations, warranties, or agreements contained herein and/or any Claims arising or resulting from the production, distribution and exploitation of the Property and the New Picture which does not result from a breach of Artist's representations, warranties or agreements contained herein.

12.    Remedies. If Producer breaches (or allegedly breaches) this Agreement, Artist will be limited to her remedy at law for damages, if any, and Artist hereby waives Artist's right to any and all claims for rescission, termination, or any other kind of injunctive or equitable relief pertaining to the Property, the Picture, the New Picture or any rights

127,514,340v3                                4

therein. Producer's remedies in the event of any breach of this Assignment Agreement shall be cumulative and the exercise of one shall not preclude the exercise of any other remedy. Artist acknowledges and agrees that the rights and privileges granted and agreed to be granted to Producer hereunder are of a special, unique, unusual, extraordinary and intellectual character, making them difficult to replace and giving them a peculiar value, the loss of which cannot be reasonably compensated in damages in an action at law and that Artist's breach of any provision hereof will cause Producer irreparable damage; therefore, Producer shall be entitled as a matter of right, at its election, to enforce this Agreement and all of the provisions hereof by injunction or other equitable relief.

13.    Notices and Payments.  All notices which Producer is required or may desire to serve upon Artist  in connection with this Agreement may be served by delivery to Artist in writing by air courier, electronic mail or facsimile to:

> ICM
> 10250 Constellation Blvd.
> Los Angeles, CA  90067
> Attn: Rick Levy
> Email:  rlevy@icmtalent.com
> Facsimile: 310-248-4592

Payments due to Artist shall be delivered to the above address.  Artist may change the address for delivery of notices and payments to Artist by written notice to Producer.

All notices which Artist is required or may desire to serve upon Producer may be served by delivery to Company in writing by air courier, electronic mail or facsimile to:

> Al's Records and Tapes
> c/o Endeavor
> 9601 Wilshire Blvd., Third Floor
> Beverly Hills, CA 90210
> Attn: Ariel Emanuel
> Email:  aemanuel@endeavorla.com
> Facsimile:  310-248-5022

With a copies to:

> Greenberg Traurig LLP
> 2450 Colorado Ave., Suite 400E
> Santa Monica, CA  90404
> Attn:  Steven Katleman
> Email:  katlemans@gtlaw.com
> Facsimile No:  (310) 586-0276

Company may change the addresses for delivery of notices and payments to Company by written notice.

The date two (2) business days after transmission of any notice hereunder by overnight air courier or the date such notice is sent by email or facsimile (with written confirmation of complete delivery), as the case may be, shall be deemed the date of service of such notice. If the date by which any such notice is to be made occurs on a Saturday, Sunday, national holiday or a day on which the business operations of the party serving the notice are not open for a full business day ("Closed Day"), then such date shall be extended without notice until the end of business on the first day thereafter which is not a Saturday, Sunday, national holiday or Closed Day.

14.    Assignment.  Producer shall have the unrestricted and unlimited right to sell, assign or otherwise dispose of this Agreement, and/or any or all of the rights granted hereunder, in whole or in part.  Artist shall have no right to assign this Agreement without the prior written consent of Producer (which consent may be withheld in Producer's sole discretion), and any attempted assignment without such consent shall be void.

15.    Miscellaneous.  This Agreement shall be governed by the laws of the State of California (exclusive of its conflict of laws provisions) applicable to agreements executed and to be wholly performed therein; and the parties hereto hereby submit to the exclusive jurisdiction of the courts located in Los Angeles County, California.  This Agreement shall not be modified except by a written document executed by both parties hereto.  This Agreement may be executed in any number of counterparts, by manual or facsimile signatures, each of which will be an original, but all of which together will constitute one and the same agreement.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, all of which shall remain in full force and effect.

IN WITNESS WHEREOF, the parties executed this Assignment Agreement effective as of the day and year first above written.


AL'S RECORDS AND TAPES


By:_____          _____
      Its Authorized Signatory                        ARETHA FRANKLIN

# EXHIBIT F



# AMAZING GRACE

DIRECTED BY **SYDNEY POLLACK**

## SYNOPSIS:

IN JANUARY OF 1972, ACADEMY AWARD WINNING DIRECTOR SYDNEY POLLACK DOCUMENTED THE RECORDING OF A LIVE ALBUM AT THE NEW TEMPLE MISSIONARY CHURCH IN LOS ANGELES, CA.

THE ALBUM SOLD OVER 2 MILLION COPIES, AND BROUGHT BACK TO THE CHURCH...

**ARETHA FRANKLIN - THE QUEEN OF SOUL**.

WHILE THE ALBUM BECAME HER BEST SELLING RECORD OF ALL TIME, THE FILM HAS NEVER BEEN SEEN.

UNTIL NOW....

**AMAZING GRACE**
A FILM BY SYDNEY POLLACK

This never-before-seen 1972 concert of Aretha Franklin's "Amazing Grace" album includes behind the scenes footage of Sydney Pollack, as well as the legendary Rev. James Cleveland, Rev. C.L. Franklin, and Mick Jagger.

*"Watching this is like seeing the Sistine Chapel as it was being painted."*
– David Ritz, Award-winning Music Author "Rhythm and the Blues"

## FEATURE DOCUMENTARY IN POST-PRODUCTION:

80 Minutes, English, Directed by Sydney Pollack

### PRODUCER : CHIEMI KARASAWA

Ms. Karasawa began Isotope Films in 2005 to produce content based on true stories. Since, she has produced and co-produced several award-winning documentaries, most notably Ellen Kuras' Emmy Award winning film "The Betrayal," Jennifer Venditti's "Billy The Kid," and Spike Jonze's "Tell Them Anything You Want: A Portrait of Maurice Sendak" for HBO. With a career in feature film, commercial and television production that spans 20 years, she has worked alongside such filmmakers as: Jim Jarmusch, Steven Frears, Spike Jonze, and Martin Scorsese. Most recently she has completed feature documentaries, "Elevate", and "Love Etc" which will be released theatrically in July 2011.

### PRODUCER, EXECUTIVE : ALAN ELLIOTT

In 2007, after learning of the original documentary filming through Jerry Wexler and Sydney Pollack, Alan Elliott acquired the rights to Pollack's 1972 footage of Aretha Franklin's live concert recording of "Amazing Grace" from Warner Bros. The album "Amazing Grace" went double platinum and remains the best-selling record of Ms. Franklin's career. The concert film will be completed posthumously in Pollack's honor in 2011.
As a composer and producer, Mr. Elliott has worked Warner Bros., Atlantic and Dreamworks Records with artists such as Prince, Miles Davis, George Clinton, and Paul Simon. Elliott has composed, orchestrated and arranged scores for the films "Secret Window", "Hitch", "Let's Go To Prison", as well as for recording artists Beck, Jamiroquai, and Supergrass, and numerous works for television. For the theatre, Mr. Elliot has been a creative consultant for Paul Simon's "The Capeman", Randy Newman's "Faust" and Larry Gelbart's Tony Award Winning "City of Angels"

## CONTACT:

Alan Elliot
alan@alanelliot.net
(323) 988-9692

Chiemi Karasawa
chiemi@isotopefilms.com
(212) 941-4090

## FILMMAKERS' CUMULATIVE AWARDS:

**Emmy Award 2009** "Exceptional Merit in Non-Fiction Filmmaking",
**Oscar Nominee 2008** "Best Documentary" 2008,
**Winner Best Documentary 2008:** SXSW,
Los Angeles FF, Edinburgh Int'l Film Festival.
**Audience Award 2010** – Hamptons Int'l Film Festival,
**Audience Award 2008** - Melbourne Int'l FF

# EXHIBIT G

Alan Elliott

Mr. Elliott's film/television production includes the upcoming miniseries of the PEN/Falkner award winning book, "The Bear Comes Home," producing the upcoming 40th Anniversary Woodstock DVD (executive produced by Martin Scorsese). For television, Mr. Elliott created and produced "The Jeanie Buss Show," (about the Los Angeles Lakers) and is also developing "The Paul McCartney Show".

Upon graduation from University, Mr. Elliott was signed to a recording contract by Warner Bros. Records.

Mr. Elliott was the first musical writer hired by Steven Bochco (the creator of "NYPD Blue") for the now infamous television musical series "Cop Rock."

Mr. Elliott worked as a staff producer/Artists and Repertoire representative at Atlantic Records, Warner Brothers Records (where he served as an "a & r man" for Prince, Miles Davis, George Clinton and Paul Simon) and Dreamworks Records.

In 1994, Mr. Elliott and Ariel Emanuel started Matter, Inc., one of the first companies to focus on entertainment programming for the internet. The company produced the first celebrity "chat show" on line for America Online in 1995 with "The Oldsmobile Hour" which featured a different celebrity answering and interacting with America Online subscribers five nights a week.

Mr. Elliott composed, orchestrated and arranged scores for such television shows as "Here and Now," and "The Naked Truth" for NBC, "The NFL on Fox" for FBC, in addition to twice composing the opening and closing themes for the Grammy Awards.

Mr. Elliott has written orchestrations, arrangements and conducted for acts such as Beck, V.A.S.T., Jamiroquai and Supergrass in addition to Varese Sarabande's tribute to Burt Bacharach. Mr. Elliott's remix work has been featured on Jamiroquai's multi-platinum "Virtual Insanity" and eel's "Susan's House."Mr. Elliott continues to find talent for record companies and was responsible for signing the band "eels" to Dreamworks Records.

Mr. Elliott produced comedian Brandon Bowlin's one man show, "Return from the Underground." As a result, Mr. Bowlin was featured as "the new voice in comedy" in the preview issue of the Sunday Los Angeles Times Calendar section.

Mr. Elliott started "Al's Records & Tapes" with funding from Interscope Records. This led to the debut release from the band Woven and the subsequent "8 Bit Monk" album, which Mr. Elliott produced.

Mr. Elliott has studied composition and orchestration with John Neufeld and Jack Smalley, theory and harmony with Jack Scalese and Kenneth Klaus as well as working and/or studying with Johnny Mandel, Quincy Jones, Dave Grusin, Henry Mancini, Wah Wah Watson, Phil Ramone, the Dust Brothers and his father, Jack Elliott.

# EXHIBIT H

"ARETHA FRANKLIN CONCERT FOOTAGE (1972)"

### QUITCLAIM AGREEMENT

THIS QUITCLAIM AGREEMENT ("Agreement") dated December ___, 2007 between, on the one hand, WARNER BROS. PICTURES, a division of WB Studio Enterprises, Inc. ("Assignor") and, on the other hand, Al's Records and Tapes and Alan Elliott (collectively, "Elliott"), whose address is c/o Steve Katleman, Esq., Greenberg, Traurig, 2450 Colorado Avenue, Suite 400 East, Santa Monica, CA 90404 ("Assignee");

### W I T N E S S E T H

In consideration of the mutual covenants and agreements herein set forth, the parties hereto agree as follows:

1.  Quitclaim:    Assignor does hereby quitclaim to Assignee, without representations or warranties of any kind, all of Assignor's right, title and interest in and to the film elements and documents (collectively, "Material") set forth in Exhibit "A" attached hereto and related to the concert performance by Aretha Franklin at the New Temple Missionary Church of Los Angeles in January of 1972 ("Project"). Assignor will, upon execution of this Agreement, deliver to Assignee a copy of the documents listed in Exhibit "A".

2.  Representations and Warranties: Assignee represents, warrants and agrees that in connection with Assignee's use of the Material, Assignee will obtain all other authorizations, consents and releases and pay all re-use fees and other compensation required by applicable collective bargaining or individual contracts or otherwise required by law. Assignee specifically understands that Assignee will need to obtain authorization from Aretha Franklin. Without limiting the foregoing, with respect to any music included in the Material as exhibited, Assignee will obtain all necessary music synchronization and performance rights (particularly from Ms. Franklin) from the copyright proprietors of such music and such other persons or entities, including performing rights societies, as may own or control the rights thereto, and will obtain all necessary master recording licenses required in connection with any music included in any audio or visual recordings of the Material.

3.  Additional Consideration:

107855V1 EMH 12/7/07
Form 203 rev. 1/13/06
Quitclaim Agreement
"Aretha Franklin Concert Footage (1972)"/Sydney Pollack

In addition to the above compensation, Assignee shall reimburse Assignor for all laboratory and shipping charges and all other direct costs and expenses incurred by Assignor in making the Material available, including, but not limited to, the cost of replacing any material that may be damaged in the process of making the Material available hereunder. Such reimbursement shall be made promptly on receipt of Licensor's invoice therefor. Assignee shall have the right to approve lab, shipping and other charges in connection with the Material prior to such charges being incurred.

4.      **Executory Obligations/Assumption Agreement**: Assignee assumes and agrees to be bound by and to perform all executory obligations of Assignor in connection with the Project including under and pursuant to the documents referred to in said Exhibit "A" and under any applicable collective bargaining agreements which are binding on Assignor.

5.      **Quitclaim Contingency**: If Assignee fails to finalize and execute this Agreement within ten (10) business days of Assignee's receipt of the Agreement, then this Agreement shall be automatically rescinded and all rights in the Project shall remain with Assignor.

6.      **Rights Personal to Assignee**: The rights quitclaimed hereunder by Assignor are personal to Assignee and as such, may not be sold, assigned, hypothecated, bequeathed or transferred by Assignee without the express prior written consent of Assignor. In the event Assignee fails to obtain such consent, the rights quitclaimed hereunder shall immediately revert to Assignor. This restriction on transfer applies to the right to produce and complete a production based on the Project, as opposed to the transfer of rights to distribute or exhibit such completed production.

8.      **First Negotiation/First Refusal**: If and when Assignee elects to sell available distribution rights in the Project, Assignee shall submit to Assignor in writing all distribution rights in the Project and Assignor shall have an opportunity to negotiate to acquire any or all such distribution rights (collectively, the "Rights") prior to Assignee negotiating with any third party.

If Assignor elects to so negotiate, Assignee and Assignor shall negotiate for a period of not less than fifteen (15) business days the terms under which Assignor would acquire the Rights. If an agreement is not reached during said 15 business day period, Assignee may thereafter enter into an agreement with any third party on principal financial terms which are not materially less favorable to Assignee than those principal financial terms last submitted by Assignee (or those last offered by Assignor, if applicable) with the same basic elements as submitted to Assignor. If Assignee desires to enter into an agreement with a third party on principal financial terms which are materially less favorable to Assignee than those last submitted by Assignee (or those last offered by Assignor, if applicable), or if the basic elements change (e.g., new narrator, new content, star involvement, etc.) or if the material Rights (e.g., media offered, territory offered, etc.) change from those last submitted by Assignee, or those last offered by Assignor, if applicable, then Assignor shall have a first refusal to acquire the applicable Rights on such less favorable terms and/or changed basic elements, which first refusal must be exercised within five (5) business days. The first refusals procedure set forth herein shall be repeated each time such principal financial terms and/or basic elements changes.

If Assignor elects at any time not to acquire Rights or if the parties fail to reach an agreement for Rights, but said Rights are still available when the picture based upon the Project is completed, Assignee shall immediately arrange for a viewing of such picture by Assignor and, upon viewing the completed picture, Assignor shall be given the first opportunity to acquire Rights on the terms set forth above for a period of five (5) business days. Assignor's rights under this paragraph 6 shall apply regardless of whether Assignee is selling distribution rights on a territory-by-territory basis or as a package.

9.   **Assignee Indemnification**: Assignee will indemnify Assignor and save and hold Assignor harmless from and against any and all claims, demands, actions and liabilities of every kind and character whatsoever, including reasonable attorneys' fees, arising out of any breach by Assignee of its obligations and/or representations contained herein or arising out of or resulting from any use made by Assignee of the Project.

10.   **Further Documents**: Each party hereto agrees to execute and deliver, or cause to be executed and delivered, all such documents, and do all such things as may be reasonably necessary and proper to carry out and effectuate the intents and purposes of this Agreement, and particularly, without limiting the generality of the foregoing, Assignor will execute and deliver, or cause to be executed and delivered, to Assignee such instruments as may be necessary and proper to vest in Assignee the rights herein assigned to Assignee as a matter of record in the United States Copyright Office, all without any further payment by or cost or expense to Assignee other than customary recording charges.

11.   <u>Parties Bound</u>:  This Agreement shall be binding upon and [except as specified otherwise herein] shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, trustees, successors and assigns.

12.   <u>Governing Law</u>:  This Agreement shall be construed in accordance with the laws of the State of California applicable to agreements which are executed and fully performed within the State of California.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS. PICTURES, a division of
WB Studio Enterprises Inc.

("Assignor")

By: _____

Its: _____
CLARA A. "ZAZI" POPE
SENIOR VICE PRESIDENT &
DEPUTY GENERAL COUNSEL

_____
ALAN ELLIOTT AND AL'S RECORDS AND TAPES   ("Assignee")

Warner Bros. Entertainment Inc. hereby joins in the foregoing quitclaim agreement to the extent of its interests and agrees to be bound by the terms thereof.

WARNER BROS. ENTERTAINMENT INC.

By: _____

Its: _____
CLARA A. "ZAZI" POPE
SENIOR VICE PRESIDENT &
DEPUTY GENERAL COUNSEL

# EXHIBIT I

1

FILED
CLERK, U.S. DISTRICT COURT

NOV 22 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

2

3

4

5

6

7

ENTERED
CLERK, U.S. DISTRICT COURT

NOV 28 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

8

9

10

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

11

12

13

14   ELVIS PRESLEY
     ENTERPRISES, et. al.          )         CV 02-7042 RSWL (RZx)
                                   )
15              Plaintiffs,        )
                                   )         **ORDER GRANTING**
16        v.                       )         **PARTIAL**
                                   )         **SUMMARY JUDGMENT**
17                                 )
     PASSPORT ENTERTAINMENT,       )
18   et. al.                       )
                                   )
19                                 )
                                   )
20              Defendants.        )
                                   )
21   _____)

22

23        Plaintiffs' Motion for Summary Judgment came on

24   regularly for hearing on November 7, 2005.  After having

25   considered all of the papers and argument in the matter and

26

1

74

1  THE COURT NOW FINDS AND RULES AS FOLLOWS:

2

3      This Court **GRANTS** Plaintiffs Motion for Summary

4  Judgment as to the issue of liability for copyright

5  infringement.  The Court finds that there is no genuine

6  issue of material fact precluding the entry of Summary

7  Judgment in favor of Elvis Presley Enterprises, Inc.,

8  National Bank of Commerce, SOFA Entertainment, Inc., Allen

9  Family Revocable Living Trust, Jerry Leiber dba Jerry Leiber

10 Music, Mike Stoller dba Mike Stoller Music, Julian J.

11 Aberbach, and Alfred Wertheimer as they are each

12 respectively holders of the copyrights in question in this

13 action.

14

15

16     This Court finds that Defendant did not establish an

17 affirmative defense for fair use.  Instead, the Court finds

18 that the balance of the four factors used to evaluate the

19 existence of a fair use affirmative defense tip in

20 Plaintiffs' favor.

21

22

23     As to the "purpose and character" factor, the Court

24 balanced the issues of (1)transformative use and (2)

25 commercial purpose.  The Court finds that infringing uses

26 are not transformative.  But even those that could be

2

1  considered potentially transformative, are still used in a
2  purely commercial setting.  It is clear from Defendants'
3  packaging that Defendants' product is a commercial work
4  seeking to profit directly from Plaintiffs' copyrighted
5  works.  Any potential showing of transformation is
6  outweighed by the wholly commercial nature of the product.
7  These two factors combined tip this factor Plaintiff's
8  favor.
9
10
11      As to the "nature of the copyrighted work" factor, the
12  Court looked to the creative and newsworthiness of the
13  copyrighted works.  Here, the works in question are creative
14  works.  Even though some of the television appearances can
15  be characterized as also being "newsworthy," their
16  newsworthy status is grounded in the creative performance
17  that takes place.  Any newsworthiness to these appearances
18  cannot be divorced from the creative nature of Elvis'
19  performance.  As to the music and still photographs, these
20  are wholly creative products protected by copyright. This
21  then weighs in favor of Plaintiffs and against a finding of
22  fair use.
23
24
25      As to the "amount and substantiality" factor, the video
26  clips in question contain either the most valuable "heart"

3

1   of the performance or a rebroadcast the copyrighted work in

2   its entirety.  By providing the viewer with the best parts

3   of each copyrighted work or the work in its entirety,

4   Defendants have extracted the most valuable part of

5   Plaintiffs' copyrights.  This factor also falls squarely in

6   Plaintiffs' favor.

7

8

9       As to the "effect on the market" factor, the commercial

10  nature of Defendants' product allows the Court to find that

11  the effect on the market is presumed.  While, the songs and

12  still pictures copyrights likely are not as effected as the

13  video clip copyrights, the compilation of all of these

14  together drastically reduce the value of Plaintiffs'

15  copyrights and significantly reduces any value of these

16  licenses.  Even if this factor is considered neutral to both

17  sides, the commercial nature cannot be ignored.

18

19

20      In weighing the four factors the balance tips in favor

21  of Plaintiffs.  Therefore, this Court finds that Defendants

22  have failed to establish the affirmative defense for fair

23  use pursuant to 17 U.S.C. § 107.

24

25

26      Regarding the issue of damages, Plaintiffs request

1  actual damages.  A grant of Summary Judgment on this issue
2  is inappropriate.  This Court finds that Defendants have
3  raised a genuine issue of material fact regarding the
4  appropriate calculation and measure of actual damages, which
5  precludes the Court from resolving this on Summary Judgment.
6  Therefore, as to damages, this Court **DENIES** Plaintiffs'
7  Motion for Summary Judgment.
8
9
10      In cases like this for copyright infringement,
11  irreparable harm is presumed on a showing of reasonable
12  likelihood of success on the merits.  See <u>Mircro Star v.</u>
13  <u>Formgen, Inc.</u>, 154 F.3d 1107, 1109 (9th Cir. 1998).  Here,
14  the Court has established that Defendants are liable for
15  copyright infringement.
16
17
18      Therefore, this Court **GRANTS** the following permanent
19  injunction pursuant to 17 U.S.C. § 502 in order to prevent
20  and restrain further copyright infringement:
21
22          Defendants are hereby enjoined from marketing,
23          distributing, advertising, transferring,
24          circulating, offering for sale, or selling the
25          product known as "25th Anniversary Elvis: The
26          Definitive Collection August 16, 1977-August 16,

1     2002" or "The Definitive Elvis" or any portion

2     thereof; or any other similar product or portion

3     thereof that contains material subject to

4     Plaintiff's copyrights.

5

6     Defendants are also enjoined from engaging in any

7     other activity infringing Plaintiffs' copyrights,

8     and assisting, aiding or abetting any other person

9     or business entity in engaging in or performing any

10    of the activities referred to above.

11

12   The Court adopts the findings of fact and conclusions

13 of law proposed by Plaintiff and modified by the Court.

14

15 IT IS SO ORDERED.

16

17                        **RONALD S.W. LEW**

18                          RONALD S.W. LEW

19                United States District Judge

20

21

22 DATED: November 22, 2005

23

24

25

26

6